785 P.2d 235

**NAVAJO ACADEMY, INC.; Thomas Atcitty, Dr. Sam Billinson, Dillon Platero, Virgil Kirk, Anita Pfeiffer, Leonard Arviso, Andrew Natonabah, Wally Davis, David Tsosie, and Cheryl Yazzie, in their official capacities as members of the Board of Trustees of Navajo Academy, Inc., Plaintiffs–Appellees,**

**v.**

**NAVAJO UNITED METHODIST MISSION SCHOOL, INC.; George Hartzog, individually and in his official capacity as Executive Director of Navajo United Methodist Mission, Richard Lewis, Janice Caster, Broadace Elkins, Pat King, Adele Hope King, Marge Knotke, David**
Saucier, Betty Todacheney, Raymond Tsosie, James Miller, in their official capacity as members of The Board of Directors of United Methodist Mission School, Inc.; and Women's Division of the Board of Global Ministries of the United Methodist Church, Defendants–Appellants.

**No. 18006.**

Supreme Court of New Mexico.

Jan. 16, 1990.

Tomita & Simpson, Susan K. Tomita, Albuquerque, Claudeen Bates Arthur, Whiteriver, Ariz., for appellants Navajo School & Hartzog.

Modrall, Sperling, Roehl, Harris & Sisk, P.A., J. Douglas Foster, Albuquerque, Owens, Whiteman & Bankes, Paul J. Bankes, Jr., Philadelphia, Pa., for appellant's Women's Div.

Roth, VanAmberg, Gross, Amarant & Rogers, Michael P. Gross, Santa Fe, for appellees.

## OPINION

MONTGOMERY, Justice.

This appeal challenges the propriety of a district court order which, while it has the effect of terminating a tenancy as to real property, allows the tenant to remain in possession of the property for an extended period after termination. The landlord, defendant below, appeals the court's order, claiming lack of substantial evidence to support its findings of fact and lack of legal ground to support the order in favor of the tenant (plaintiff below). We hold that, given the trial court's findings and the unusual circumstances of this case, the court did not abuse its equitable discretion as a court of equity in permitting the tenant to remain on the property for three years following termination of the lease, and accordingly we affirm.

## I.

The Navajo Academy, Inc. (the Academy), is a New Mexico corporation organized by the Navajo Tribe to operate a preparatory school for Navajo college-bound youth. Originally located in Ganado, Arizona, it moved its campus to Farmington, New Mexico, in 1978 at the invitation of the Navajo United Methodist Mission School, Inc. (the Mission School). The Mission School is a New Mexico corporation operated in conjunction with the United Methodist Church to conduct a school in Farmington. Its facilities were deteriorating and its student enrollment declining when it invited the Academy to move to the Farmington campus and commence operations there.

The terms and conditions of this move were not written. There was an understanding, however, between the Academy's headmaster and the Mission School's superintendent that the Academy could occupy as much of the campus, including dormitories, classrooms and support buildings, as it needed to house its program, rent-free. There was a tacit understanding that the Academy could stay on the campus for as long as it provided a quality educational program for Navajo children.

In the 1978–79 school year, the Academy's enrollment was about twenty-five students. Because of the quality of its program and the fact that it charged no tuition, whereas the Mission School did make such a charge, the Academy's enrollment climbed steadily and the Mission School's enrollment declined. Within a few years the Mission School had lost all of its students, who were now enrolled in the Academy, and by the 1986–87 school year the Academy's enrollment had grown to approximately 250 students.

The one hundred-acre Farmington campus is owned by the Women's Division of

the Board of Global Ministries of the United Methodist Church (the Women's Division). Over the years, the Women's Division had leased the campus to the Mission School in a series of four-year leases which were continually renewed. By 1982 the Academy had come to occupy virtually the entire campus. The original understanding remained unwritten but became even more clearly understood to encompass a long-term relationship of indefinite duration. At about the same time, it also became clear that something had to be done about the deteriorating condition of the campus. The Academy and the Mission School agreed on a course of action: The Academy would make application to the Bureau of Indian Affairs (BIA) for substantial sums of money to repair and renovate the facilities, and the Mission School would support this application with a commitment that the Academy would have the use of the campus for a long term. Pursuant to this arrangement, the Mission School delivered to the Academy an executed copy of a resolution by the Mission School's board authorizing and directing the development of a long-term lease with an indefinite term of no less than twenty-five years. The trial court found that this resolution constituted a promise to provide a long-term lease so that the BIA would embark on a multi-year program of providing substantial sums to the Academy for facilities repair and renovation.

In the same year, 1982, the parties began entering into what was to be a series of short-term subleases, under which the Academy leased the campus from the Mission School for each succeeding school year from 1982–83 to 1986–87. (In 1983–84 there was a direct lease between the Women's Division and the Academy.) Neither the subleases nor the 1983–84 direct lease required that any rent, other than a token amount, be paid. The only consideration for these leases was performance by the Academy of its commitment to provide a quality educational program for Navajo youth and to carry out ordinary maintenance of the facilities. The trial court found that the sub-leases were not intended to replace the understanding between the

Academy and the Mission School relating to the Academy's continued, indefinite occupancy of the campus.

The Mission School's promise to provide a long-term lease was not kept. For one thing, the Women's Division had a strict policy against leasing its property for periods longer than four years, and despite the efforts of the Academy and the Mission School that policy could not be changed. However, according to the trial court's findings, the Women's Division condoned the relationship between the Academy and the Mission School and placed representatives of the Mission School in positions of apparent authority to act for and bind the Women's Division. As the years went on, the Academy and the Mission School explored alternative ways of accomplishing their mutual objective of a long-term relationship, including a possible merger between the two corporations, a joint venture and, toward the end, development of a master plan to accommodate both organizations.

In 1987 the relationship between the two organizations began quickly to deteriorate. The Mission School requested that, for the next ensuing school year (1987–88), substantial rent ($220,000.00) be paid by the Academy. The Mission School proposed other changes in the sublease relationship and eventually delivered an ultimatum to the Academy requiring it to vacate the property if the Mission School's new sublease was not signed by a stipulated date. At that time the Mission School's new superintendent, Dr. Hartzog, in consultation with representatives of the National Division of the Board of Global Ministries of the United Methodist Church, had already decided that the relationship between the Mission School and the Academy would have to end. The Academy, for its part, sent a letter to the National Division and the Women's Division repudiating the concept of a cooperative relationship with the Mission School with respect to the educational program carried out by the Academy. It had become clear that the relationship had broken down and that the Acade-

my's occupancy of the campus would have to end.

The Mission School thereupon brought an action in magistrate court for forcible entry and detainer, seeking to evict the Academy. The Academy responded by bringing this action in the District Court for San Juan County to prohibit the magistrate court from entertaining the eviction action and to obtain various other forms of relief. Among the items of relief sought in the Academy's complaint were a declaration that it was entitled to continued occupancy of the property under a "constructive" long-term lease, damages of $1,800,-000 for conversion as a result of its expenditures in improving the campus, declaratory and injunctive relief on behalf of the students and compensatory and punitive damages for interference with contractual relations. After a five-day bench trial, the court entered findings of fact and conclusions of law generally favorable to the Academy but awarding none of the relief requested except for the order permitting the Academy to remain on the campus for three years after the date of the trial court's judgment.

## II.

On appeal, the Mission School and the Women's Division raise essentially two issues. First, they assert that the trial court's critical findings of fact (some of which have been referred to above; others of which will be mentioned below) are not supported by substantial evidence. Second, they argue that those findings, and the resultant conclusions, conflict with various principles of contract law: The trial court's reliance on an oral agreement conflicts with an unambiguous written agreement and therefore violates the parol evidence rule; the trial court's conclusion that the oral agreement created a lease for more than three years contravenes the statute of frauds; and, since under the trial court's own findings the Academy was only a tenant at will, the tenancy could be terminated by either party, which the Mission School did in 1987. A third issue asserted by the Mission School is a variation on the

substantial evidence point; it claims that an integral and inseparable part of the understanding between the Academy and the Mission School was that the educational program would be a cooperative venture and that the Academy's repudiation of this understanding justified the Mission School in terminating the agreement looking toward a long-term lease.

The first and third issues mentioned above can be disposed of quickly. The appellants, Mission School and Women's Division, appear to recognize, as they must, that this Court is bound by the trial court's findings of fact if those findings are supported by substantial evidence in the record. *Getz v. Equitable Life Assurance Soc'y of the United States*, 90 N.M. 195, 561 P.2d 468, *cert. denied*, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977). As in *Register v. Roberson Construction Co.*, 106 N.M. 243, 245, 741 P.2d 1364, 1366 (1987), "our conclusions concerning the facts of this case are not based on an original and independent analysis of the record. Rather, we take the trial court's findings of fact as binding because that is our duty on appeal." This is not to say that we have not attempted to assay the record to determine whether substantial evidence does support the findings; we have indeed conducted such a review and have found that the findings are adequately supported under the governing standard: "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*, 106 N.M. at 245, 741 P.2d at 1366.

■ Similarly, the Mission School's third issue—that the Academy's repudiation of the Mission School's continued involvement in the Academy's education program prevents it from relying on any understanding as to a long-term lease relationship—fails, for two reasons. First, the trial court made no finding as to such an "integral" feature of the agreement. It found, on the contrary, that the agreement under which the Mission School would provide the Academy with a long-term lease was a *unilateral* agreement: A promise by the Mission School to provide the lease in exchange for

the Academy's making various expenditures for repairs, renovations and improvements on the campus. Unilateral contracts are defined in the first Restatement of Contracts:

> A unilateral contract is one in which no promisor receives a promise as consideration for his promise. A bilateral contract is one in which there are mutual promises between two parties to the contract; each party being both a promisor and a promisee.

Restatement of Contracts § 12 (1932). *See also id.,* comment a: "In a unilateral contract the exchange for the promise is something other than a promise." As we have indicated, the trial court's findings in this regard are supported by substantial evidence.

The second reason why the Mission School's additional argument fails is that it misapprehends the significance of the unilateral contract found by the trial court and relies on the existence of an executory, bilateral agreement as the basis for its assertion that the Academy's repudiation of its commitment under this type of agreement excused the Mission School from complying with *its* obligations. Again, the trial court did not find that any such bilateral agreement, contemplating a promise by the Academy to engage in a cooperative relationship in exchange for the Mission School's promise to give a long-term lease, existed. *See Farrar v. Hood,* 56 N.M. 724, 729, 249 P.2d 759, 762 (1952) (findings of fact supported by substantial evidence are the facts upon which case is to be decided on appeal); *Gibbons & . Reed Co. v. Bureau of Revenue,* 80 N.M. 462, 464, 457 P.2d 710, 712 (1969) (failure to make specific finding of fact regarded as finding against the party having the burden of establishing the fact). The trial court found that the Mission School promised to give a twenty-five-year lease in exchange for the making of certain expenditures by the Academy. It is undisputed that the Academy did make those expenditures (even though the funds for the expenditures were derived from the BIA), and our review of the evidence convinces us that the Mission School did indeed promise to enter into a long-term lease in exchange for these expenditures. It is similarly undisputed that the Mission School never tendered a long-term lease. Therefore, it breached the agreement which the trial court found, and that breach had nothing to do with the Academy's own disavowal of any future involvement by the Mission School in its educational program.

■ The appellants' arguments that enforcement of a promise to give a long-term lease would violate the parol evidence rule, the statute of frauds, and principles of the landlord-tenant relationship in a tenancy at will have greater substance. We find, however, that they are all bottomed on another misapprehension similar to that mentioned above, namely, a misunderstanding of the nature of the agreement actually found by the trial court and the relief actually afforded by its order. All three of the sub-arguments are predicated on the same erroneous proposition—that the trial court in effect specifically enforced the promise to give a long-term lease, when in actuality it recognized that the tenancy between the parties was terminated and, in order to reach an equitable result, permitted the Academy to remain on the premises for a period of time.

As noted earlier in this opinion, the Academy's complaint sought a declaration that it was entitled to a "constructive" long-term lease. In this respect, its request for relief was similar to that of the tenant in *Ammerman v. City Stores Co.,* 394 F.2d 950 (D.C.Cir.1968). In that case a developer's promise to give a prospective tenant a lease in a shopping center was specifically enforced on the basis of a trial court's finding that the promise was given in exchange for a letter from the prospective tenant to a municipal zoning authority supporting the developer's proposed rezoning of the tract on which the shopping center was to be built. For similar cases *see Annotation, Specific Performance of Lease of, or Binding Option to Lease, Building or Part of Building to be Constructed,* 38 A.L.R.3d 1052 (1971).

Here, despite the assumption underlying most or all of the appellants' arguments, the trial court did *not* specifically enforce the Mission School's promise to give a twenty-five-year lease. Rather, the trial court determined, in effect, that the Academy's leasehold interest had terminated—or was, as appellants argue, "terminable at will"—but nevertheless considered the practical effect of an order evicting the Academy from the premises. The trial court further considered the equities in the case before it and found that the Academy had come before the court with clean hands. Under the circumstances, therefore, the trial court decided that the most equitable remedy, while making clear that the Academy would be required to vacate the premises at the end of three years at most, would be to grant it that long a period in which to locate a new campus and move its 250 students to another location. As indicated previously, we do not believe that the fashioning of this equitable remedy, in a suit invoking the equitable powers of the court, was an abuse of discretion.

### III.

At bottom, this suit was originated by the Mission School when it applied to the magistrate for relief from forcible entry and detainer. When the Academy sought to prohibit the magistrate court from entertaining this action, it requested equitable relief in the form of a declaration that it held under a "constructive" long-term lease. Though the original action was to prevent relief by way of forcible entry and detainer, which has its origins at law, and to enforce a long-term lease, it is anything but new for this Court to validate an equitable solution to a problem such as the one before us when a party asks for justice and a "legal" remedy is inadequate; "equity frequently interferes." *Romero v. Muños*, 1 N.M. 314, 316 (1859). In *Romero* the Court was asked to reverse a trial court ruling denying the request of a woman who sought injunctive relief. She had been awarded a judgment in an action for ejectment of a tenant from her land. The ejected tenant reentered the land, took possession and tore up her crops. When she sued

the tenant, the tenant argued that there was an existing legal remedy which would preclude equitable jurisdiction, and the trial court agreed. The Court did not, saying:

Equity obtains jurisdiction where the remedy at law is not plain, adequate, and complete. It is not enough to exclude its jurisdiction that there is a remedy at law. The remedy should be equal to give complete redress. If it fails in some essential quality, the equity may be invoked.

*Id.,* 1 N.M. at 315. *See also Hilburn v. Brodhead,* 79 N.M. 460, 464, 444 P.2d 971, 975 (1968) ("[A] court of equity has power to meet the problem presented, and to fashion a proper remedy to accomplish a just and proper result."); 1 J. Pomeroy, Equity Jurisprudence Sec. 109 (5th ed. 1941):

Equitable remedies ... are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.

In the case at bar, the trial court devised a remedy that permits the Academy to continue functioning as a school as it searches for a new home. In somewhat similar circumstances, courts of equity have relieved the tenant from the requirement that he vacate the leased premises immediately upon expiration of the lease. *See In re Weinberg's Estate,* 177 Misc. 587, 31 N.Y.S.2d 445, (1941) (year-to-year tenant, too ill to be removed from apartment when lease ended, permitted to remain for six months, after which tenant died; estate of tenant held not liable for rent for balance of year since tenant was not "holdover" tenant in wrongful possession of apartment); *Eden v. Southern Colorado Midget Racing, Inc.,* 153 Colo. 58, 384 P.2d 732 (1963) (lease of race track for as long as used as a particular kind of track; tenant allowed to stay where tenant used track for different type of racing, improved property and continued to pay rent). *Cf. Politelli v. Gianfrancesco,* 98 R.I. 252, 201

A.2d 129 (1964) (tenant improved building relying on promises from landlord that written lease would be provided; court ordered specific performance of promise to lease for three years).

The applicable standard of review of a trial court's order affording the tenant equitable relief of the type granted by the trial court in this case is that set forth in *Wolf & Klar Cos. v. Garner*, 101 N.M. 116, 118, 679 P.2d 258, 260 (1984), in which this Court said:

> The application of doctrines of "clean hands" or other such equitable defenses rests in the sound discretion of the trial court. *Home Savings & Loan Ass'n v. Bates*, 76 N.M. 660, 417 P.2d 798 (1966). Absent a clear abuse of discretion, the trial court's exercise thereof will not be disturbed on appeal. *Flinchum Const. Co. v. Central Glass & Mirror Co.*, 94 N.M. 398, 611 P.2d 221 (1980). Since it cannot be said that the court exceeded the bounds of reason, all circumstances before it being considered, *Independent Steel & Wire Co. v. New Mexico Cent. R.R. Co.*, 25 N.M. 160, 178 P. 842 (1919), we do not find an abuse of discretion....

In this case, the trial court found that, because of the Academy's reasonable reliance on the Mission School's promise of a long-term relationship, the Academy refrained from searching for new facilities or applying for federal funds to construct a new facility as other Navajo schools had done in recent years. Instead, the court found, the Academy spent substantial sums of money (obtained from the BIA) on major repairs, renovations and improvements of the Mission School's campus and that those improvements were accepted by the owner of the property, the Women's Division. As a result, the court further found, when the dispute arose the Academy had no alternative facilities to which to move its education program, and the Mission School and the Women's Division had obtained the benefit of a quality program plus renovated and repaired school facilities. During the pendency of the action, the Academy commenced efforts to search for a new home; but it was unlikely, according to the trial court, that a new home would be found and made available in less than three years.

The trial court went on to find that, were the Academy to be evicted from the campus before alternative facilities became available, its education program would be destroyed. The Academy had built up a quality program for college-bound Navajo students and enjoyed a high reputation for the excellence of that program. This program, if lost, would constitute a major setback for Navajo education.

As noted, the trial court also held that, because of the Academy's substantial compliance with the terms of the parties' understanding and subleases, it came before the court with clean hands. At the same time, the Mission School had not complied with those terms, particularly in the respect that it had failed to tender to the Academy any form of the long-term lease as it had promised. Instead, it had accepted the benefits of the substantial expenditures made by the Academy to improve the Mission School and Women's Division property. Similarly, the Women's Division had accepted the fruits of the Academy's expenditures and approved the long-term presence of the Academy on its premises.

Under all of these circumstances, the trial court found it would be inequitable to evict the Academy without at least giving it a reasonable opportunity to find a new home. We believe that this remedy did not "exceed the bounds of reason," since, in addition to all the other factors, the numerous and costly improvements the Academy bestowed upon the Mission School campus can be viewed as the equivalent of several years' rent. We conclude that the trial court's order permitting the Academy to remain on the campus for a period of time not to exceed three years from the date of the judgment was not an abuse of discretion, and the judgment is affirmed.

IT IS SO ORDERED.

RANSOM and BACA, JJ., concur.